[Cite as *In re Adoption of A.E.C.*, 2024-Ohio-5559.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

IN RE:  THE ADOPTION OF:                       CASE NO. 16-24-10

  A.E.C.

[BENNY B. - APPELLANT]                         **O P I N I O N**

**Appeal from Wyandot County Common Pleas Court
Probate Division
Trial Court No. 20225011**

**Judgment Affirmed**

**Date of Decision: November 25, 2024**

APPEARANCES:

  *Howard A. Elliott* **for Appellant**

  *Kelle M. Saull* **for Appellee**

**WALDICK, J.**

{¶1} Respondent-appellant, Benny B. ("Benny"), appeals the May 20, 2024 judgment of the Wyandot County Common Pleas Court, Probate Division, in which the trial court granted a final order of adoption of Benny's minor daughter, "A.E.C.", after finding that Benny's consent was not required for the adoption. For the reasons set forth below, we affirm.

*Procedural History*

{¶2} On July 18, 2022, petitioners-appellees, Scott C. ("Scott") and Lisa C. ("Lisa"), filed a petition pursuant to R.C. 3107.05 for adoption of A.E.C., who was born in 2017 and is the biological daughter of Erin S. ("Erin") and Benny.[1] The petition asserted that Erin's consent to the adoption was required, and a written consent to the adoption signed by Erin was filed with the petition. The petition further asserted that Benny's consent was not required for the adoption. Specifically, the petition alleged that Benny had failed without justifiable cause to provide more than de minimis contact with the child for a period of at least one year immediately preceding the filing of the adoption petition, and also that Benny had failed without justifiable cause to provide for the maintenance and

---

[1] While this case was captioned in the trial court from the beginning as "In the Matter of the Adoption of A.E.C.", as required by R.C. 3107.04(C), the child's initials were actually A.E.S. at the time the petition was filed. The petition requested that the child's name be changed to A.E.C. as part of the adoption, and that name change was ultimately ordered by the trial court when the adoption was granted. To be consistent with the case caption, and in light of the subsequently ordered name change, we refer to the child as "A.E.C." throughout this opinion.

support of the child as required by law or judicial decree for at least that same time period.

{¶3} On January 3, 2023, Benny filed a handwritten letter with the court, objecting to the petition seeking to adopt his daughter. On January 17, 2023, counsel filed a formal objection to the adoption on Benny's behalf.

{¶4} On November 17, 2023, an evidentiary hearing was held on the issue of whether Benny's consent was required for the adoption.

{¶5} On November 22, 2023, Benny filed a "Submission of Supplemental Case Law." In that filing, Benny asserted that his purported failure to provide support for A.E.C. was justified due to a "zero-support" court order in Allen County, Ohio, and cited to *In re Adoption of B.I.*, 2019-Ohio-2450, in support of his position. Benny further asserted that his purported failure to provide more than de minimis contact with A.E.C. was justified due to Scott and Lisa requesting through A.E.C.'s paternal grandmother that Benny not have contact with, or be known to, the child.

{¶6} On November 27, 2023, Scott and Lisa filed a response with citations to a number of Ohio court decisions in support of their position that Benny's consent was not required.

{¶7} On December 5, 2023, the probate court filed a judgment entry finding that Benny's consent to the adoption was not required. The probate court based that decision on two alternative findings: (1) that Benny had failed without justifiable

cause to provide more than de minimis contact with A.E.C. as alleged in the petition, and (2) that Benny had failed to provide for the maintenance and support of A.E.C. as required by law or judicial decree, as also alleged in the petition.

{¶8} On May 7, 2024, an evidentiary hearing was held on the issue of whether the adoption was in the best interest of A.E.C. At the conclusion of that hearing, the probate court ruled from the bench that adoption was in the best interest of A.E.C.

{¶9} On May 20, 2024, the probate court filed a final decree of adoption. In that decree, the court found that adoption was in the best interest of the child and granted the petition for adoption. On June 5, 2024, the probate court filed a nunc pro tunc final decree of adoption, in order to correct an erroneous case number on the May 20, 2024 decree.

{¶10} On June 12, 2024, Benny filed the instant appeal, in which he raises three assignments of error for our review.

### First Assignment of Error

**The trial court committed reversible error requiring the setting aside of the adoption decree herein and the remand to the trial court for further proceedings by holding that the father's consent to the adoption petition was not required by finding that he had failed to provide for the maintenance and support of the child as required by law and judicial decree for a period of one year immediately preceding the filing of the adoption petition.**

### Second Assignment of Error

**The trial court committed error requiring the court to set aside the adoption petition and remand to the trial court for further**

**proceedings by finding that father's consent was not necessary to the petition for adoption because he had failed without justifiable cause to provide more than de minimis contact with the child for a one-year period of time prior to the filing of the adoption petition.**

### Third Assignment of Error

**The trial court committed reversible error requiring the court to set aside the ruling of the adoption petition and remand these proceedings to the trial court by finding the best interest of the child is best served by the granting of the adoption petition.**

{¶11} Because our resolution of the second assignment of error renders the first assignment of error moot, we elect to address the assignments of error out of the order in which they are raised.

### *Second Assignment of Error*

{¶12} In the second assignment of error, Benny argues that the trial court erred in finding that Benny's consent to the adoption was not required on the basis that he had failed without justifiable cause to have more than de minimis contact with the child for the one-year period preceding the filing of the adoption petition.

{¶13} On appeal, Benny appears to concede that he did not have more than de minimis contact with A.E.C. for the one-year period prior to the adoption petition being filed, a concession that is supported by the record. However, Benny asserts that his lack of contact with his daughter during that time period was justified and that the trial court erred in finding otherwise.

{¶14} "[T]he right of a natural parent to the care and custody of his children is one of the most precious and fundamental in law." *In re Adoption of Masa*, 23 Ohio St.3d 163, 165 (1986). "Under most circumstances, both of a minor's natural parents must provide written consent prior to the adoption of that minor." *In re Adoption of S.S.*, 2017-Ohio-8956, ¶ 16 (3d Dist.).

{¶15} However, R.C. 3107.07 sets forth exceptions to that general rule regarding consent. R.C. 3107.07(A), the exception relevant here, provides:

> Consent to adoption is not required of * * * [a] parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

{¶16} Because adoption terminates fundamental rights of the natural parent or parents, the Supreme Court of Ohio has repeatedly held that "'[a]ny exception to the requirement of parental consent [to adoption] must be strictly construed so as to protect the right of natural parents to raise and nurture their children.'" *In re Adoption of G.V.*, 2010-Ohio-3349, ¶ 6, quoting *In re Adoption of Masa*, *supra*, at 165.

{¶17} The application of R.C. 3107.07(A) involves a two-step analysis. *In re Adoption of M.B.*, 2012-Ohio-236, ¶ 23. As this Court explained in *In re Adoption of K.C.*, 2014-Ohio-3985 (3d Dist.):

The first step involves deciding a factual question—in this case, whether the parent willfully had failed to provide more than de minimis contact with the minor child. *See In re R.L.H.,* 2d Dist. Montgomery No. 25734, 2013-Ohio-3462, citing *M.B.* at ¶ 21. "A trial court has discretion to make these determinations, and in connection with the first step of the analysis, an appellate court applies an abuse-of-discretion standard when reviewing a probate court decision * * *." *M.B.* at ¶ 25. In the second step, if a probate court finds a failure to provide more than de minimis contact, the court then determines the issue of whether there is justifiable cause for the failure. *Id.* at ¶ 23. A probate court's decision on whether justifiable cause exists will not be disturbed on appeal unless the determination is against the manifest weight of the evidence. *Id.* at ¶ 24; *In re Adoption of Masa,* 23 Ohio St.3d 163, paragraph two of the syllabus, (1986).

*Id.*, at ¶ 23.

{¶18} Pursuant to R.C. 3107.07, the party petitioning for adoption has the burden of proving, by clear and convincing evidence, that a parent failed to have more than de minimis contact with the child during the one-year period prior to filing the adoption petition and that there was no justifiable cause for the lack of contact. *In re Adoption of Bovett*, 33 Ohio St.3d 102 (1987), paragraph one of the syllabus, following *In re Adoption of Masa*, *supra*, paragraph one of the syllabus (extending *In re Adoption of Holcomb*, 18 Ohio St.3d 361 (1985), paragraph four of the syllabus).

{¶19} As to the second prong of that two-step analysis, "[s]ignificant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication, is

required to establish justifiable cause for the non-custodial parent's failure to communicate with the child." *Holcomb*, *supra*, paragraph three of the syllabus.

{¶20} In *Holcomb*, the Supreme Court of Ohio noted that the term "justifiable cause" in R.C. 3107.07(A) lacks a precise definition, and the Court declined to define the term. *Id.*, at 367. Instead, the Ohio Supreme Court left to the trial court, as the finder of fact, the question of whether justifiable cause for failure to communicate with the child exists in a particular case. *Id.* The Ohio Supreme Court reasoned that the trial court "is in the best position to observe the demeanor of the parties, to assess their credibility, and to determine the accuracy of their testimony." *Id.*

{¶21} As noted above, the question of whether justifiable cause has been proven by clear and convincing evidence in a particular case is a determination for the trial court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence. *See also Masa*, *supra*, at paragraph two of the syllabus.

{¶22} In *In re Z.C.*, 2023-Ohio-4703, at ¶ 14, the Supreme Court of Ohio recently reaffirmed how a manifest-weight review should be conducted, stating:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179] at ¶ 20. "In weighing the evidence, the court of appeals

must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

**{¶23}** In the instant case, at the November 17, 2023 hearing on the issue of consent, Benny was the first witness to testify, as if on cross-examination. Benny testified that he was currently incarcerated at the Allen Correctional Institution in Lima, Ohio, where he had been housed for six months, serving a prison sentence for trafficking and possessing methamphetamine. Prior to that, Benny had been incarcerated since 2019 at the prison located in Marion, Ohio, where he was serving time for trafficking in methamphetamine. Prior to being incarcerated at Marion, Benny had been incarcerated since 2018 at North Central Correctional Institution. Prior to beginning his prison sentences in mid-2018, Benny had resided in the Allen County Jail since March of 2018. Benny testified that, prior to that, he had no home and lived on the street.

**{¶24}** Benny testified that he has one child, A.E.C., who was born in 2017. Benny acknowledged that he had been incarcerated for most of his daughter's life. Benny confirmed that he had never met Scott or Lisa, who were A.E.C.'s

guardians at the time of the hearing and who had cared for A.E.C. since she was an infant.

{¶25} Upon inquiry, Benny acknowledged that, while he was incarcerated, he was nonetheless permitted to make phone calls, send letters, send gifts, and have visitors. Benny confirmed that he had access to a prison law library and that he had previously filed court documents on his own behalf. Benny confirmed that he had never filed anything with any court seeking to see A.E.C. While Benny acknowledged that he had never made a phone call to A.E.C. at Scott and Lisa's home, Benny testified that they would not allow him to speak to A.E.C. Benny testified that he had written at least one letter to A.E.C., but that he did not send it to the home where she resided. Benny testified that he had gifts given to A.E.C. through his mother, whose name is Gina B. ("Gina").

{¶26} Benny testified that from July 18, 2021 to July 18, 2022, he had the ability to make phone calls and that, while he did not call A.E.C. at the home of her guardians, he tried calling A.E.C. when his mother had the child. When asked again, Benny agreed that from July 18, 2021 to July 18, 2022, he made no efforts to call his daughter directly, he did not send his daughter any letters, and he did not send her any gifts, cards, photos, or money. Benny also acknowledged that there were no court orders that restricted his access to A.E.C.

{¶27} Ultimately, Benny agreed that during the one-year period from July 18, 2021 to July 18, 2022, he made zero efforts to see his child and that, financially, he provided nothing for A.E.C. during that same timeframe.

{¶28} Lisa was the next witness to testify. Lisa testified that she had been caring for A.E.C. since the child was about three weeks old, because A.E.C.'s mother had gone back to work and needed help with daycare. Lisa would pick up the baby on Thursdays and then keep her for a few days before she would be returned to her mother. In December of 2017, A.E.C. came to live to live with Lisa and Scott because the child's mother was unable to care for her. The mother subsequently consented to a guardianship and had also consented to the adoption at issue. The guardianship had been granted to Lisa and Scott on November 28, 2021.

{¶29} Lisa testified that, during the one-year period prior to July 18, 2022, she kept notes on matters relating to A.E.C. Lisa testified that A.E.C. had no contact with her father during that one-year period. Specifically, Lisa confirmed that Benny did not call, never sent a letter or a gift, and made no effort to see his daughter.

{¶30} Lisa testified that she is in contact with Gina, Benny's mother, and that Gina had been to Lisa's home. Lisa testified that both Benny's mother and grandmother knew Lisa and Scott's residential address and phone number.

{¶31} Lisa testified that Gina, the paternal grandmother, had no contact with A.E.C. from October 23, 2019 to May 18, 2021. However, Lisa then invited Gina to A.E.C.'s birthday party and some contact between A.E.C. and Gina resumed. On

September 14, 2021, Lisa and A.E.C. met Gina at the park and, afterwards, A.E.C. told Lisa that her grandmother had let her talk on the phone with her father. Lisa testified that A.E.C. was very confused as to who she had talked to and so, as a result, Lisa asked Gina to hold off on explaining to A.E.C. who Benny was. While Gina did not necessarily concur with Lisa's perspective, she agreed to wait until A.E.C. was older to explain who her father was and where her father was living. Lisa testified that she did not prohibit Gina from letting A.E.C. talk to Benny but, rather, Lisa did not want A.E.C. upset and confused by the details of her conception and birth and the fact that her father was in prison.

{¶32} Lisa then detailed the other dates that A.E.C. spent time with Gina from July 18, 2021 to July 18, 2022, testifying that Gina had contact with A.E.C. on eight dates during that time period. Lisa testified that A.E.C. was alone with Gina without supervision by Lisa on only three of those dates and those would have been the only other times during that one-year period in which A.E.C. could have had phone contact with Benny, facilitated by Gina.

{¶33} Finally, Lisa testified that she and her husband had not done anything to prohibit Benny from having contact with A.E.C. and that, had anything from Benny arrived at their home for A.E.C., the child would have been permitted to have it.

{¶34} Scott was the third witness at the hearing. Scott testified that he had been able to hear all of Lisa's testimony and that it was true and accurate. Scott

testified that he had never seen anything come to his home for A.E.C. from Benny, meaning no letters, gifts, packages, or other such items. Scott testified that they had received no financial support or support such as clothing for A.E.C. from Benny. Scott testified that he had not in any way thwarted Benny's ability to see his child.

{¶35} Erin, the biological mother of A.E.C., also testified at the hearing. Erin confirmed that she had previously consented to Scott and Lisa having guardianship of A.E.C., and that she had also given consent to the adoption. Erin concurred with the testimony indicating that Scott and Lisa had been raising A.E.C. since she was approximately three weeks old. Erin testified that she was not aware of any effort made by Benny to be a part of A.E.C.'s life.

{¶36} Benny then again took the stand and testified under direct examination by his own attorney. Benny identified Respondent's Exhibit 1 as being a support order issued by Allen County, reflecting that Benny has a "zero" child support obligation to Erin with regard to A.E.C. Benny testified that, to his knowledge, that court order had never been modified nor had any other support orders been issued.

{¶37} Benny acknowledged that any contact he had with A.E.C. was limited to phone calls placed by him to his mother. He testified that he had some phone conversations with A.E.C. that were facilitated by his mother but he did not specify when those phone calls took place. Per the request of Lisa and Scott, Benny had identified himself as "Ben" in those conversations. Benny testified that he had not

sought parenting time with A.E.C. because he did not believe prison visits were appropriate for a young child. Benny confirmed that he had previously written out cards and letters to A.E.C. but had not sent them, as he was saving them to read to her someday. Benny testified that he received some information about A.E.C.'s schooling and extracurricular activities through his mother. Benny confirmed that he was not consenting to the adoption.

{¶38} On cross-examination, Benny was asked how many times he had spoken to A.E.C. in the time period from July 18, 2021 to July 18, 2022. Initially he testified that he could not give an accurate answer to that question, but then he testified that he spoke with A.E.C. every time the child was with his mother, which he estimated to be nine or ten times. Benny acknowledged that he did not keep notes or a calendar of those phone conversations. Finally, Benny acknowledged that A.E.C. does not know who he is due to his lack of contact with her.

{¶39} The final witness at the hearing on the issue of consent was Benny's mother, Gina B. Gina testified that she had been granted permission by Scott and Lisa to see A.E.C., which occurred once per month for a year to a year and a half prior to the hearing. Gina stated that she previously saw A.E.C. other places, such as at the park, but that had been prior to COVID. Gina testified that, through her, Benny used to have some phone contact with A.E.C., but it had been a couple of years since that had last occurred. When asked to specify when the phone contact between Benny and A.E.C. had stopped, she stated that she could not recall. Gina

testified that Lisa had implied that Gina would not be able to see A.E.C. if Benny had contact with the child, and so Gina had stopped the phone conversations between Benny and A.E.C. However, Gina still passed along information to Benny that she received about A.E.C. from Lisa, relating to school and sports. Gina testified that Benny had never given her any money to buy gifts for A.E.C. because Benny does not have any money. Gina testified that she believed that Scott and Lisa did not want A.E.C. to know who Benny was and, further, that she believed she would lose her time with A.E.C. if she continued to let Benny speak to his daughter. Gina explained that she had been asked by Lisa to not identify Benny to A.E.C. as her dad, as A.E.C. refers to Scott and to her biological mother's husband as her dads.

**{¶40}** During cross-examination, Gina was asked if Benny had sent her any money for A.E.C. from July of 2021 until July of 2022, and Gina testified that she did not know.

**{¶41}** On appeal, Benny argues that his consent was required for the adoption because interference by Lisa in his communications with A.E.C. provided justifiable cause for his lack of more than de minimis contact with the child in the year immediately preceding the filing of the adoption petition. However, following a thorough review of the record, we find that the trial court's decision to the contrary on that issue was supported by clear and convincing evidence.

**{¶42}** In support of our conclusion, we note that Lisa's overall testimony reflected that she did not object generally to telephone contact between Benny and A.E.C. but, rather, was only concerned with the possibility of A.E.C. being provided with unfiltered information about her father, particularly information of a nature that could confuse and worry a young child. Regarding the number of telephone contacts that Benny had with A.E.C. over the year in question, Lisa testified that she knew of just one phone call that occurred while she and A.E.C. were visiting with Gina at the park, when Benny apparently called his mother and Gina put A.E.C. on the phone. There was conflicting testimony given by Gina and Benny as to whether any additional phone conversations took place between father and daughter during that time. On the other hand, Lisa's testimony was very clear that she did not prohibit Gina from letting A.E.C. talk to Benny on the phone and, in fact, permitted Gina to have unsupervised visits with A.E.C. during which such phone calls could have occurred. Gina's testimony corroborated the fact that she had been permitted unsupervised visits with her granddaughter.

**{¶43}** Additionally, there were multiple instances at the hearing where Benny indicated by his testimony that he did not believe Lisa and Scott would permit him to have contact with A.E.C. and Benny suggested that is why he did not send letters, gifts, or try to call his daughter at the home of her guardians. However, there was no evidence presented that Lisa or Scott ever actually tried to thwart any efforts made by Benny to make contact with A.E.C. through her guardians, particularly as

Benny acknowledged never having made any such efforts. Similarly, Gina's overall testimony reflected that she curtailed her facilitation of phone conversations between Benny and A.E.C. due to Gina's concern that she might be prohibited from seeing A.E.C., not because Lisa or Scott ever took such action.

{¶44} In summary, the record lacks evidence of significant interference or significant discouragement by Lisa or Scott as to communication between Benny and his daughter. Thus, the trial court's finding that there was not justifiable cause for Benny's lack of contact with A.E.C. during the year in question was not against the manifest weight of the evidence. Accordingly, the trial court did not err in finding that Benny's consent to the adoption was not required pursuant to R.C. 3107.07(A), on the basis that Benny failed without justifiable cause to provide more than de minimis contact with his child during the year immediately preceding the filing of the adoption petition.

{¶45} The second assignment of error is overruled.

*First Assignment of Error*

{¶46} In the first assignment of error, Benny argues that the trial court erred in finding that Benny's consent to the adoption was not required on the basis that he had failed to provide for the maintenance and support of A.E.C. in the one-year period immediately preceding the filing of the adoption petition. Specifically, Benny asserts that his failure to provide support for A.E.C. was justified due to a "zero-support" court order previously entered with regard to Benny's duty to pay

child support. Benny relies upon the case of *In re Adoption of B.I.*, 2019-Ohio-2450, in support of his position.

**{¶47}** However, as previously noted, R.C. 3107.07(A) provides that consent to adoption is not required of a child's parent when it is established by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor *or* to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding the filing of the adoption petition.

**{¶48}** Accordingly, our resolution of the second assignment of error, *supra*, renders the first assignment of error moot and we decline to address it. See App.R. 12(A)(1)(c).

*Third Assignment of Error*

**{¶49}** In the third assignment of error, Benny argues that the trial court erred in determining that adoption was in the best interest of A.E.C.

**{¶50}** Pursuant to R.C. 3107.161(C), a person contesting an adoption petition has the burden of providing "material evidence needed to determine what is in the best interest of the child" and the burden of establishing "that the child's current placement is not the least detrimental available alternative." For those purposes, the "least detrimental available alternative" means "the alternative that would have the least long-term negative impact on the child." R.C. 3107.161(A).

-18-

{¶51} We review a probate court's decision to grant or deny an adoption petition under an abuse of discretion standard. *In Re Adoption of Ridenour*, 61 Ohio St.3d 319, 320 (1991). To find an abuse of discretion, we consider whether the court's decision is unreasonable, arbitrary, or unconscionable. *Id.*

{¶52} Regarding the required analysis of a child's best interest in an adoption, R.C. 3107.161(B) provides:

> When a court makes a determination in a contested adoption concerning the best interest of a child, the court shall consider all relevant factors including, but not limited to, all of the following:
>
> (1) The least detrimental available alternative for safeguarding the child's growth and development;
>
> (2) The age and health of the child at the time the best interest determination is made and, if applicable, at the time the child was removed from the home;
>
> (3) The wishes of the child in any case in which the child's age and maturity makes this feasible;
>
> (4) The duration of the separation of the child from a parent;
>
> (5) Whether the child will be able to enter into a more stable and permanent family relationship, taking into account the conditions of the child's current placement, the likelihood of future placements, and the results of prior placements;
>
> (6) The likelihood of safe reunification with a parent within a reasonable period of time;
>
> (7) The importance of providing permanency, stability, and continuity of relationships for the child;

(8) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(9) The child's adjustment to the child's current home, school, and community;

(10) The mental and physical health of all persons involved in the situation;

(11) Whether any person involved in the situation has been convicted of, pleaded guilty to, or accused of any criminal offense involving any act that resulted in a child being abused or neglected; whether the person, in a case in which a child has been adjudicated to be an abused or neglected child, has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether the person has been convicted of, pleaded guilty to, or accused of a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the person's family or household; and whether the person has been convicted of, pleaded guilty to, or accused of any offense involving a victim who at the time of the commission of the offense was a member of the person's family or household and caused physical harm to the victim in the commission of the offense.

**{¶53}** A probate court is not required to list each factor set out in R.C. 3107.161(B) but, in order for an order granting an adoption to be upheld, the record must reflect consideration of those factors by the trial court. *Matter of Adoption of M.R.M.*, 2017-Ohio-7710, ¶ 15 (7th Dist.).

**{¶54}** In the instant case, at the May 7, 2024 hearing on the issue of whether adoption was in the best interest of A.E.C., Lisa was the first witness to testify. Lisa testified that she and her husband, Scott, live in Wharton, Ohio, with their son, two daughters, and A.E.C., along with Lisa's mother, who had just moved in. Lisa and Scott began caring for A.E.C. several days per week when the child was three weeks

old, and A.E.C. had lived in their home and been in their full-time care since she was three months old. A.E.C. was six years old at the time of the hearing and views Scott as her dad, Lisa as her mom, and their home as her home. While Scott and Lisa already had a guardianship of A.E.C., Lisa testified that they wished to make their relationship with A.E.C. permanent through adoption. Lisa testified that, in her eyes, heart, and life, A.E.C. is her child. Lisa testified that A.E.C. has no health issues, interacts well with the other children in the home, and is a "daddy's girl" when it comes to Scott. Lisa confirmed that A.E.C. has never had a relationship with her biological father, but that she sees her biological mother a couple of times per month. Lisa and Scott have been married since 2007, and treat A.E.C. as one of their children, and Lisa testified that she believes it is certainly in A.E.C.'s best interest that she be adopted. On cross-examination, Lisa testified that she had talked with Gina, A.E.C.'s paternal grandmother, and Lisa wants A.E.C. to continue to have a relationship with Gina.

{¶55} Scott was the next witness to testify. Scott testified that Lisa's testimony was accurate as to where they live, who lives in their home, and A.E.C.'s life with them. Scott also opined that it would be in A.E.C.'s best interest to continue to live in their home. Scott testified that adopting A.E.C. was important to he and Lisa because A.E.C. knows them as her parents, they feel that they are her parents, they love the child, and want to legally give A.E.C. stability and permanency. Scott testified that he has no mental health issues, no drug or alcohol

issues, and there are no safety issues in their home. Scott testified that A.E.C. was part of their family, just like their other children, and they would continue to provide for all of the things that she needs. On cross-examination, Scott testified that adoption is important to them because they legally want to make A.E.C. part of their family.

{¶56} Gina was the third witness at the hearing. Gina testified that she is A.E.C.'s paternal grandmother, as Gina's son is A.E.C.'s father. Gina testified that she would like A.E.C. to know the truth and to have a relationship with her father and their family. Gina testified that A.E.C. is a big part of their lives and Gina wanted that to continue. Gina testified that she has been able to see A.E.C. frequently, that the two of them have an amazing relationship, and A.E.C. also has a strong bond with other family members of Gina's. Gina was worried that A.E.C. would have a great sense of loss if that were taken away from her. Gina testified that she does her best to talk to A.E.C. about her father, Benny, without explaining that he is the child's dad. Gina testified that Lisa said it was a deal breaker if Gina gave details to A.E.C. about Benny, and so Gina felt she would not be able to see the child if she violated Lisa's wishes. Gina testified that, while Benny is in prison, he is a good man who loves his daughter and he would be an excellent father. Gina testified that she did not want to take A.E.C. away from Scott and Lisa, but that she wanted to give the child the right to know her biological family and provide answers to the questions A.E.C. has about her biological family members.

{¶57} On cross-examination, Gina acknowledged that Benny has not parented A.E.C. since she was just a few weeks old. Gina further acknowledged that her opinion that Benny would be a great dad was completely hypothetical because he had never been a father to the child, as a result of his own actions. Gina agreed that her son was not able to take custody of A.E.C. in the foreseeable future. Gina further agreed that she believed stability and permanency and safety were important for A.E.C.

{¶58} The fourth witness to testify was Laura C.-F. ("Laura"), who is A.E.C.'s paternal great-grandmother. Laura testified that establishing paternity was very important to a child, based on her experience working for the child support enforcement agency. Laura opposed the adoption because A.E.C. has a mother and a father and legal guardians. Based on Laura's presence at the majority of the visits A.E.C. has with her grandmother, Gina, Laura testified that A.E.C. has a connection with her biological family and Laura believed that connection should continue. Laura testified that it was important for A.E.C. to know the truth about her biological parents. Laura testified that A.E.C. had been deceived because the child believes she has two mothers and two fathers, with Benny being her third father. Laura testified that her other concern with the adoption was that it could limit access to the medical history of A.E.C.'s biological family, should A.E.C. ever need that information. Laura testified that she was concerned adoption would sever A.E.C. from the lives of her biological family.

{¶59} On cross-examination, Laura testified that it was not accurate that A.E.C. had been living with Scott and Lisa since she was a baby. Laura acknowledged that Benny had not been a father to A.E.C. because he has been incarcerated essentially her whole life. Laura also acknowledged that neither biological parent of A.E.C. is in a position to take custody of her. Laura testified that she believed Scott and Lisa having legal guardianship of A.E.C. was sufficient.

{¶60} The final witness at the hearing was A.E.C.'s biological father, Benny. Benny testified that he is an inmate who has been incarcerated with the Ohio Department of Rehabilitation and Correction for nearly seven years, and that his "out date" is in March of 2026. Benny testified that he believes the current guardianship is adequate and that he opposes the adoption because A.E.C. also has a relationship with his family. Benny acknowledged that Scott and Lisa are good people and that he is appreciative of them caring for A.E.C. Benny testified that he keeps track of A.E.C., his only child, through his family. Benny testified that it is important for him to be in A.E.C.'s life because some day she will find out that Scott and Lisa are not her real parents and that will kill her trust for the people who raised her.

{¶61} On cross-examination, Benny acknowledged that, because he is in prison, it would not be in A.E.C.'s best interest for him to take custody of her. Benny testified that he does not understand why the child's biological mother cannot take custody, nor does he understand why the mother consented to the

adoption. Benny testified that he did not believe it is in the best interest of A.E.C. for her to be adopted, unless Scott and Lisa continued to let A.E.C. see her biological family. Benny acknowledged, however, that stability for his daughter would be in her best interest.

{¶62} On redirect-examination, Benny testified that he was concerned that Scott and Lisa would not allow him to have contact with his daughter because they had requested that restrictions be imposed on his phone calls from prison with the child.

{¶63} Following the presentation of evidence and closing arguments by counsel, the trial court reviewed the evidence in the case, the factors the court found relevant, and ruled from the bench that adoption was in the best interest of A.E.C. On May 20, 2024, the trial court filed a final decree of adoption. In that decree, the court again found that adoption was in the best interest of the child and granted the petition for adoption.

{¶64} On appeal, Benny argues that the trial court erred in its determination that adoption was in the best interest of A.E.C.

{¶65} A review of the probate court's ruling in this case reflects that the court expressly noted that it had factors to consider in making its decision as to A.E.C.'s best interest. In rendering its decision from the bench, while the trial court did not specifically cite to or quote any specific subsections of R.C. 3107.161(B), the trial

court did reference evidence relevant to many of the R.C. 3107.161(B) factors before making the finding that the adoption was in A.E.C.'s best interest.

{¶66} More importantly, there was evidence presented at the hearing going toward nearly all of the statutory best interest factors and which supported the trial court's decision.

{¶67} The first factor relates to the least detrimental available alternative for safeguarding the child's growth and development. Scott and Lisa are A.E.C.'s legal guardians and she has lived with them for nearly her entire life. Scott and Lisa are, in effect, the only "parents" that A.E.C. has ever known, and she seems to have thrived in their care and custody.

{¶68} The second factor is the age and health of the child. At the time of the hearing, A.E.C. was six years old, with no health issues.

{¶69} The third factor is the wishes of the child in any case in which the child's age and maturity make it feasible that the child's wishes be known. There was no evidence presented as to A.E.C.'s wishes regarding the adoption, presumably due to her young age.

{¶70} The fourth factor is the duration of the separation of the child from a parent. A.E.C. has lived with Scott and Lisa and has been entirely in their care since she was three months old.

{¶71} The fifth factor is whether the child will be able to enter into a more stable and permanent family relationship, taking into account the conditions of the

child's current placement, the likelihood of future placements, and the results of prior placements. The evidence established that A.E.C.'s only home from the time she was an infant has been with Scott and Lisa. There was no evidence that a more stable and permanent placement was likely in the future with anyone else.

{¶72} The sixth factor is the likelihood of safe reunification with a parent within a reasonable time. The evidence reflected that there was little to no likelihood that A.E.C. could be safely reunified with a parent within a reasonable time, as her biological mother was unable or unwilling to care for her and her biological father would be in prison until 2026.

{¶73} The seventh factor is the importance of providing permanency, stability, and continuity of relationships for the child. The evidence was undisputed that Scott and Lisa have provided permanency and stability and a close familial relationship for A.E.C., and that they would continue to do so in the future.

{¶74} The eighth factor is the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest. While in Scott and Lisa's custody and care, A.E.C. has maintained monthly visits with her biological mother. Facilitated by Scott and Lisa, A.E.C. has also had regular visitation with her paternal grandmother and other members of her biological father's family. The evidence also established that A.E.C. has a healthy "family life" with Scott and Lisa and their children.

{¶75} The ninth factor is the child's adjustment to the child's current home, school, and community. The evidence established that A.E.C. appears to be extremely well-adjusted to life in Scott and Lisa's home, and that she is active in sports and school-related activities.

{¶76} The tenth factor is the mental and physical health of all persons involved in the situation. There was no evidence reflecting that the mental or physical health of either Scott or Lisa was a concern with regard to A.E.C.'s well-being. On the other hand, A.E.C.'s biological father, Benny, is serving a long prison term for drug-related issues, which may have potentially impacted his mental or physical health.

{¶77} The final factor is whether any person involved in the situation has been involved in a case where a child was abused or neglected, or a domestic violence case. There was no evidence presented at the hearing relating to this factor, but the background report ordered and filed in the case reflected no such involvement on the part of Scott or Lisa.

{¶78} Upon consideration of those statutory factors, along with all other relevant information presented in the case, the record fully supports the probate court's finding that adoption of A.E.C. by Scott and Lisa was in the child's best interest. Thus, the trial court did not abuse its discretion in making that determination.

{¶79} The third assignment of error is overruled.

*Conclusion*

**{¶80}** Having found no error prejudicial to the appellant, Benny B., in the particulars assigned and argued, the judgment of the Wyandot County Court of Common Pleas, Probate Division, is affirmed.

***Judgment affirmed***

**WILLAMOWSKI, P.J. AND ZIMMERMAN, J., concur.**