[Cite as *In re Adoption of T.M.Z.*, 2025-Ohio-5000.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

IN RE:  THE ADOPTION OF:

T.M.Z.

[ANDREW W. - APPELLANT]

CASE NO. 13-25-07

OPINION AND
JUDGMENT ENTRY

Appeal from Seneca County Common Pleas Court
Probate Division
Trial Court No. 20245020

Judgment Affirmed

Date of Decision:  November 3, 2025

APPEARANCES:

*Timothy J. Hoover* for Appellant

*Jennifer L. Kahler* for Appellee

**ZIMMERMAN, J.**

{¶1} Biological father-appellant, Andrew W. ("Andrew"), appeals the January 24, 2025 judgment of the Seneca County Court of Common Pleas, Probate Division, granting a final order of adoption of Andrew's minor child, T.M.Z., after finding that his consent was not required because he failed without justifiable cause to have contact with T.M.Z. for the one-year period immediately preceding the filing of the adoption petition. For the reasons that follow, we affirm.

{¶2} T.M.Z. was born in 2018 to K.Z. ("Mother") and Andrew, who were not married. Andrew lived with Mother for approximately six weeks after T.M.Z.'s birth. Shortly thereafter, Andrew and Mother's relationship ended.

{¶3} The last time Andrew saw T.M.Z. was in April of 2019.

{¶4} Mother started dating Z.Z. ("Stepfather") in early 2019 and they married in 2023. Mother and Stepfather have two children together and Stepfather has adopted Mother's oldest child.

{¶5} On August 13, 2024, Stepfather filed a petition for adoption of T.M.Z. The petition included Mother's consent to the adoption and asserted that Andrew's consent was not required because, among other things, he had failed without justifiable cause to have contact with T.M.Z. for the previous one-year period.

{¶6} On January 6, 2025, the trial court held a hearing to determine whether Andrew's consent was required for the adoption. Following the hearing, the trial

court issued a judgment entry finding that Andrew's consent was not required because he failed, without justifiable cause, to have contact with T.M.Z. for the one-year period immediately preceding the filing of the petition.

{¶7} After determining that Andrew's consent was not required, the trial court held a hearing on January 21, 2025 to consider whether the adoption was in T.M.Z.'s best interest. The trial court took the matter under advisement and, on January 24, 2025, issued a judgment entry granting Stepfather's adoption petition.

{¶8} On January 31, 2025, Andrew filed his notice of appeal, raising three assignments of error for our review.

## First Assignment of Error

**The trial court's finding that Appellant's consent was not necessary was against the manifest weight of the evidence.**

{¶9} In his first assignment of error, Andrew argues that the trial court erred by determining that his consent was not required for the adoption. Specifically, he argues that—even though he had no contact with T.M.Z. during the one-year period prior to the filing of the adoption petition—he had justifiable cause because Mother "secreted herself and [T.M.Z.]." (Appellant's Brief at 10).

*Standard of Review*

{¶10} "[T]he right of a natural parent to the care and custody of his children is one of the most precious and fundamental in law." *In re Adoption of Masa*, 23 Ohio St.3d 163, 165 (1986). "Under most circumstances, both of a minor's natural

parents must provide written consent prior to the adoption of that minor." *In re Adoption of S.S.*, 2017-Ohio-8956, ¶ 16 (3d Dist.). However, consent to an adoption is not required of

> [a] parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor . . . for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

R.C. 3107.07(A) (2015).[1]

{¶11} The application of R.C. 3107.07(A) involves "a two-step analysis." *In re Adoption of M.B.*, 2012-Ohio-236, ¶ 23. First, the court must determine whether the parent failed to provide more than de minimis contact with the child for the one-year time period. *In re Adoption of H.R.*, 2014-Ohio-5390, ¶ 25 (3d Dist.). Second, "if a probate court finds the parent failed to provide more than de minimis contact . . . , the court then determines 'whether justifiable cause for the failure has been proved by clear and convincing evidence.'" *Id.*, quoting *M.B.* at ¶ 23.

{¶12} "Clear and convincing evidence is that measure or degree of proof . . . which will produce in the mind of the trier of facts a firm belief or conviction as to

---

[1] Effective March 21, 2025, R.C. 3107.07(A) was amended to state, in relevant part, that a court must find "by clear and convincing evidence that the parent has failed without justifiable cause to *have* more than de minimis contact with the minor" for the applicable one-year period before an adoption can proceed without that parent's consent. (Emphasis added.) Specifically, the 2025 amendment replaced the word "provide" with "have" as it relates to the contact between the nonconsenting parent and the child during the relevant one-year period. This change does not affect the issues presented here.

the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954),

paragraph three of the syllabus.

{¶13} "'A probate court's decision on whether justifiable cause exists will

not be disturbed on appeal unless the determination is against the manifest weight

of the evidence.'" *H.R.* at ¶ 25, quoting *In re Adoption of K.C.* 2014-Ohio-3985, ¶

23 (3d Dist.).

> "In determining whether a judgment is against the manifest weight of
> the evidence, we must review the entire record, weigh the evidence
> and all reasonable inferences, consider witness credibility and
> determine whether, in resolving conflicts in the evidence, the trier of
> fact clearly lost its way and created such a manifest miscarriage of
> justice that there must be a reversal of the judgment and an order for
> a new trial."

*In re Adoption of C.N.A.*, 2018-Ohio-897, ¶ 9 (3d Dist.), quoting *In re Adoption of*

*N.T.R.*, 2017-Ohio-265, ¶ 11 (10th Dist.).

*Analysis*

{¶14} In this case, Andrew acknowledges that he did not have contact with

T.M.Z. during the applicable one-year time period. On appeal, he argues that the

trial court erred by finding that his lack of contact was without justifiable cause.

Andrew contends that the greater weight of the evidence shows that there was

justifiable cause for his lack of contact since Mother "screen[ed] off [Andrew] from

his child." (Appellant's Brief at 10).

{¶15} The term "justifiable cause" is not defined in R.C. 3107.07(A). The

Ohio Supreme Court has "refused to adopt a 'precise and inflexible meaning' for

'justifiable cause,' but instead has stated that 'the better-reasoned approach would be to leave to the probate court as finder of fact the question of whether or not justifiable cause exists.'" *In re Adoption of J.M.M.*, 2021-Ohio-775, ¶ 26 (3d Dist.), quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 367 (1985). However, justifiable cause can be established with evidence that there was "significant interference" or "significant discouragement" by a custodial parent with contact between the non-custodial parent and the child. *Holcomb* at 367-368.

{¶16} Here, the record reflects that the trial court heard testimony from several witnesses at the hearing held on January 6, 2025. Mother testified that she and Andrew abused drugs together during their relationship. After T.M.Z. was born in 2018, Andrew stayed with Mother for six weeks in a home owned by Mother on First Avenue in Tiffin, Ohio. When Andrew became abusive toward Mother, Mother ended the relationship and sought a civil protection order ("CPO"). The CPO was issued in August 2018, and remained in effect until August 2021. Notably, the CPO did not list T.M.Z. as a protected person.

{¶17} In early 2019, Mother sought treatment for substance abuse. While Mother was hospitalized, T.M.Z.'s maternal grandmother ("Maternal Grandmother") petitioned the Seneca County Court of Common Pleas, Juvenile Division, for legal custody of T.M.Z. In February 2019, the juvenile court granted Maternal Grandmother temporary custody of T.M.Z. The juvenile court further ordered Andrew to pay child support and granted him supervised visitation with

T.M.Z. at Patchworks House. Andrew did not exercise visitation with T.M.Z. at Patchworks House. On March 19, 2019, the juvenile court restored Mother's custodial rights to T.M.Z.

{¶18} During this same time period, and while the CPO was still in effect, Andrew continued to contact Mother on her cell phone. Mother testified that Andrew would call or message her asking to see T.M.Z. When Mother told Andrew to "go through the courts," Andrew would get "verbally abusive" and call Mother derogatory names. (Jan. 6, 2025 Tr. at 25). Mother blocked Andrew's number. When Andrew continued to contact Mother's cell phone using approximately 50 different phone numbers, Mother changed her cell phone number.

{¶19} In October 2019, Mother vacated the First Avenue property and moved in with Stepfather. Even though Mother left the First Avenue property, she maintained ownership of the property and her brothers currently reside there. T.M.Z.'s uncle ("Uncle") testified at the hearing that he has lived at the First Avenue property for five years. Uncle further testified that—during the five years he has lived there—neither Andrew nor any member of Andrew's family has appeared at the property looking for Mother or T.M.Z. Uncle has never received mail for Mother at the First Avenue property, nor has Uncle received any gifts, cards, or letters for Mother or T.M.Z. at the property.

{¶20} Similarly, Maternal Grandmother testified at the hearing that neither Andrew nor any member of his family has ever reached out to her trying to locate

Mother or T.M.Z. Maternal Grandmother further testified that she has lived at the same address for 28 years. Andrew is aware of Maternal Grandmother's address, having been there "[m]ultiple times" when he and Mother were together. (Jan. 6, 2025 Tr. at 52).

{¶21} Mother and Stepfather currently reside on County Road 30 in Tiffin. They purchased the County Road 30 property in June 2023. Prior to that, Mother and Stepfather resided on Hall Street in Tiffin since October 2019. Stepfather owned the Hall Street property. Mother testified that she has lived in Tiffin during the entirety of T.M.Z.'s life.

{¶22} As to Andrew's most-recent communication, Mother testified that Andrew sent her a message through Facebook on July 15, 2022 stating that he was "in the process of filing [a] motion for visitation with [T.M.Z.]" and needed "answers." (Jan. 6, 2025 Tr. at Ex. 8). Mother did not respond to the message. On August 4, 2022, Andrew sent another Facebook message to Mother stating, "I don't know why I had to choose such a shitty mom for my [child]." (*Id.* at Ex. 9). Mother did not respond to this message either and she received no further communication from Andrew. Mother testified that—during the one-year period prior to filing the adoption petition—neither Andrew nor any member of his family has reached out to her regarding T.M.Z. Mother has not received cards, letters, or gifts for T.M.Z. from Andrew or any member of his family.

{¶23} Stepfather testified at the hearing that he and Mother have been together for approximately six years. Stepfather further testified that, even though he had never met Andrew, Andrew sent him a Facebook message on August 20, 2022 asking for Mother's address. The message stated that Andrew was T.M.Z.'s "real father" and blamed Mother for making Andrew "look like" the "bad one." (Jan. 6, 2025 Tr. at Ex. 10). At the time the message was sent, Mother and Stepfather were living together at the Hall Street property owned by Stepfather. Stepfather did not respond to Andrew's message and he received no further communication from Andrew. Stepfather testified that his address is "easy to Google." (*Id.* at 59). Stepfather further testified that—during the one-year time period—neither Andrew nor any member of Andrew's family has reached out to him regarding T.M.Z. Stepfather has not received cards, letters, or gifts for T.M.Z. from Andrew or any member of Andrew's family.

{¶24} Andrew testified at the hearing that the last time he saw T.M.Z. was in April of 2019. Andrew further testified that he served two years in prison from September 2019 to September 2021 for aggravated trafficking in drugs. While in prison, Andrew attempted to call Mother—but she blocked his number. Following his release from prison, Andrew obtained a motion for visitation from the courthouse in the summer of 2022. According to Andrew, he sent Facebook messages to Mother and Stepfather to get Mother's address so he "could file a Motion for Visitation rights." (Jan. 6, 2025 Tr. at 72).

{¶25} Andrew testified that he "Googled [Mother's] name" and found the First Avenue address. (*Id.* at 83). Since he was aware that Mother no longer lived at that address, Andrew "stopped" his online search because he "didn't have anywhere else to go with it." (*Id.*). Andrew testified that he "drove around Tiffin a couple of times" to see if he "could catch a glimpse of them outside a house or something." (*Id.* at 83-84). Andrew also contacted the Tiffin Police Department, the Seneca County Sheriff's Department, and "Child Support" and was told that they could not give him Mother's address. (*Id.* at 84).

{¶26} Andrew testified that he has been employed since his release from prison and that he is capable of working 40 hours per week. Andrew lives with his mother, brother, and his mother's husband. Andrew pays rent to his mother and helps out financially, if asked. Andrew testified that he never intended to abandon T.M.Z. and that he never gave up trying to find his child. He did not send gifts, cards, or letters because he did not know Mother's address. Andrew testified that he did not file a motion for visitation because he "had no luck getting [Mother's] address." (Jan. 6, 2025 Tr. at 87). Andrew further testified that he did not hire a private investigator to locate Mother's address, nor did he hire an attorney to assist him in filing a motion for visitation.

{¶27} Andrew's mother testified at the hearing that the last time she saw T.M.Z. was in the summer of 2019, before Andrew went to prison. Andrew's mother further testified that she "didn't really" have a relationship with T.M.Z.

because she "didn't get to see [T.M.Z.] very often." (*Id.* at 122). After Andrew went to prison, Andrew's mother tried to contact Mother by phone and through Facebook but was "blocked." (*Id.* at 120).

{¶28} After considering the evidence presented by the parties, the trial court found that Andrew's lack of contact with T.M.Z. during the relevant one-year time period was without justifiable cause. The trial court stated as follows:

> Mother did not prevent [Andrew] from exercising his [c]ourt-ordered visitation at Patchworks House. Instead, [Andrew] failed to take advantage of that privilege on his own. Additionally, Mother did not prevent [Andrew] from filing an action to modify visitation with the [j]uvenile [c]ourt. The Court does not find credible [Andrew]'s testimony regarding his efforts to find [M]other's address, and as a result his alleged inability to file visitation paperwork. Even if [Andrew] could not find Mother's address, he was not precluded from filing, as service could have been made on Mother in other ways. It is this Court's position that, by failing to exercise the visitation to which he was entitled and by failing to file any action to modify his visitation [o]rder with the [c]hild, [Andrew] cannot now credibly claim justifiable cause for his lack of contact with the [c]hild during the [s]tatutory [t]ime [p]eriod.

(Doc. No. 34).

{¶29} We recognize that the trial court was in the best position to weigh the parties' testimony, and thus, we defer to the trial court in making credibility determinations. *Holcomb*, 18 Ohio St.3d at 367 ("The probate court is in the best position to observe the demeanor of the parties, to assess their credibility, and to determine the accuracy of their testimony."). Moreover, the record establishes that Andrew made little to no effort to have contact with T.M.Z. once he and Mother

were no longer in a relationship. Andrew's attempts to have contact with T.M.Z. were limited to Facebook messages sent to Mother and Stepfather outside the one-year period prior to the filing of the adoption petition. Despite obtaining a motion for visitation, Andrew never filed his request with the court.

{¶30} Contrary to Andrew's contention, the record does not contain credible evidence that Mother intentionally concealed T.M.Z.'s whereabouts. Mother testified that she has lived in Tiffin during the entirety of T.M.Z.'s life. Even though Mother vacated the First Avenue property in October 2019, she maintained ownership of the property and her brothers currently reside there. From 2019 to 2023, Mother and Stepfather lived together in a home owned by Stepfather. From June 2023 to the filing of the adoption petition, Mother and Stepfather resided in a home they purchased together. Despite knowing that Mother and Stepfather were together, Andrew "never Googled [Stepfather]" to locate an address. (Jan. 6. 2025 Tr. at 103).

{¶31} Based on the foregoing, we conclude that the trial court's determination that Andrew was without justifiable cause for his failure to have contact with T.M.Z. during the relevant one-year time period is not against the manifest weight of the evidence.

{¶32} Accordingly, Andrew's first assignment of error is overruled.

**Second Assignment of Error**

**The trial court's finding that adoption was in the best interests of the child was against the manifest weight of the evidence.**

**Third Assignment of Error**

**The trial court erred and abused its discretion in admitting the adoption assessor's report, which was prejudicial to Appellant.**

{¶33} In his second and third assignments of error, Andrew argues that the trial court "lost its way" when it granted Stepfather's adoption petition because it "did not address all of the 'best interests' factors found in [R.C. 3107.161(B)]" in its judgment entry. (Appellant's Brief at 14). Andrew further argues that the trial court abused its discretion by admitting the assessor's report because the report was "highly prejudicial." (*Id.* at 14).

*Standard of Review*

{¶34} We will not reverse a trial court's best-interest determination absent an abuse of discretion. *In re Adoption of Deems*, 91 Ohio App.3d 552, 557-558 (3d Dist. 1993), citing *In re Adoption of Charles B.*, 50 Ohio St.3d 88, 90 (1990). Similarly, we will not disturb a trial court's evidentiary ruling absent a finding that the trial court abused its discretion. *In re B.R.*, 2025-Ohio-599, ¶ 12 (3d Dist.). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

*Analysis*

**{¶35}** On appeal, Andrew argues that the trial court's best-interest determination is against the manifest weight of the evidence since the trial court did not address each factor set forth in R.C. 3107.161(B) in its judgment entry. Andrew claims that the assessor's report impermissibly "filled in the gaps" as to the best-interest factors and "should have been stricken from the record." (Appellant's Brief at 14). We disagree.

**{¶36}** In determining whether a contested adoption is in the best interest of a child, a trial court must consider all relevant factors including, but not limited to, the following:

> (1) The least detrimental available alternative for safeguarding the child's growth and development;
>
> (2) The age and health of the child at the time the best interest determination is made and, if applicable, at the time the child was removed from the home;
>
> (3) The wishes of the child in any case in which the child's age and maturity makes this feasible;
>
> (4) The duration of the separation of the child from a parent;
>
> (5) Whether the child will be able to enter into a more stable and permanent family relationship, taking into account the conditions of the child's current placement, the likelihood of future placements, and the results of prior placements;
>
> (6) The likelihood of safe reunification with a parent within a reasonable period of time;

(7) The importance of providing permanency, stability, and continuity of relationships for the child;

(8) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(9) The child's adjustment to the child's current home, school, and community;

(10) The mental and physical health of all persons involved in the situation;

(11) Whether any person involved in the situation has been convicted of, pleaded guilty to, or accused of any criminal offense involving any act that resulted in a child being abused or neglected; whether the person, in a case in which a child has been adjudicated to be an abused or neglected child, has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether the person has been convicted of, pleaded guilty to, or accused of a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the person's family or household; and whether the person has been convicted of, pleaded guilty to, or accused of any offense involving a victim who at the time of the commission of the offense was a member of the person's family or household and caused physical harm to the victim in the commission of the offense.

R.C. 3107.161(B).[2]  "A [trial] court is not required to list each factor set out in R.C. 3107.161(B) but, in order for an order granting an adoption to be upheld, the record must reflect consideration of those factors by the trial court." *In re Adoption of A.E.C.*, 2024-Ohio-5559, ¶ 53 (3d Dist.).

---

[2] We note that R.C. 3107.161 was amended on March 20, 2025.  The 2025 amendment, however, did not alter the provisions of R.C. 3107.161(B).

{¶37} In this case, the trial court held a "best interest" hearing on January 21, 2025 to determine whether granting Stepfather's adoption petition was in T.M.Z.'s best interest. Mother testified at the best-interest hearing that she and T.M.Z. began living with Stepfather when T.M.Z. was one and one-half years old. T.M.Z. calls Stepfather "Dad" and Stepfather recently adopted T.M.Z.'s older sibling. Mother testified that T.M.Z. loves Stepfather and has a relationship with Stepfather's family. Mother further testified that Stepfather is employed and financially supports their family. Stepfather's mother also testified at the best-interest hearing. Stepfather's mother has known T.M.Z. for approximately six years and considers T.M.Z. to be her grandchild. Stepfather's mother has seen the close bond between T.M.Z. and Stepfather and she supports the adoption petition.

{¶38} Stepfather testified at the best-interest hearing that he has a strong relationship with T.M.Z. Stepfather loves T.M.Z. and is prepared to raise T.M.Z. as his own. T.M.Z. has lived with Stepfather for approximately six years. T.M.Z. is adjusted to Stepfather's home and to the family's schedule. T.M.Z. enjoys playing in the backyard, taking horseback riding lessons, and playing soccer. Stepfather is in good health and gainfully employed.

{¶39} Andrew testified at the best-interest hearing that T.M.Z. would benefit from a relationship with him because he is T.M.Z.'s "biological father" and "not a bad guy." (Jan. 21, 2025 Tr. at 48). According to Andrew, "I can, just like anybody else, I can be a father." (*Id.*). Andrew testified that, if given the opportunity to have

a relationship with T.M.Z., he would be able to comport himself appropriately and not make threats or express anger toward Mother and Stepfather for the benefit of T.M.Z. Andrew further testified that he is currently unemployed and living with his mother and her husband.

{¶40} On January 24, 2025, the trial court issued its judgment entry granting Stepfather's adoption petition. As to T.M.Z.'s best interest, the trial court found as follows:

> The Court finds this adoption to be in the best interest of [T.M.Z.]. The Court also finds that [Stepfather] is suitably qualified to care for and rear [T.M.Z.]. No evidence was presented which would indicate the adoption is contrary to [T.M.Z.]'s best interest. Instead, all evidence points to [Stepfather]'s ability to care for, provide for, and love [T.M.Z.] as his own, which is consistent with what he has been doing for the majority of [T.M.Z.]'s life. Specifically, [Stepfather] has maintained consistent employment and provided for Mother, [T.M.Z.], and their family for the past six years. In fact, the evidence presented to the Court indicates that [Stepfather] is the *only* father [T.M.Z.] has ever known -- [T.M.Z.] has lived with him since [T.M.Z.] was 1.5 years old. Additionally, [T.M.Z.] has strong loving relationships with [Stepfather]'s family. In contrast, [T.M.Z.] has absolutely no relationship with [Andrew] or his family. In fact, the evidence shows that [Andrew] has had no contact with [T.M.Z.] since 2019.

(Emphasis in original.) (Doc. No. 40). The trial court further found that Stepfather "has been a father to [T.M.Z.] in every possible way." (*Id.*). The trial court noted that T.M.Z. needs permanency, stability, and continuity of relationships and that T.M.Z. "has consistently experienced all three with [Stepfather] for the past six years." (*Id.*). The trial court further noted that T.M.Z. is a happy and healthy seven-

year-old child, who is well adjusted to life with Stepfather and loves spending time with him. The trial court found that Andrew "presented absolutely no evidence that the [p]etition is not in [T.M.Z.]'s best interest." (*Id.*).

{¶41} After careful consideration of the record in this case, we conclude that the trial court did not abuse its discretion in making its best-interest determination. The record reflects that the trial court considered the factors set forth in R.C. 3107.161(B) in making its best-interest determination. *See A.E.C.*, 2024-Ohio-5559, at ¶ 53 (3d Dist.). Specifically, the trial court's January 24, 2025 judgment entry lists the best-interest factors and states that it "has carefully reviewed all relevant factors herein, including those articulated in R.C. Section 3107.161." (Doc. No. 40). Moreover, the record contains competent, credible evidence to support the trial court's finding that granting Stepfather's adoption petition was in T.M.Z.'s best interest. Therefore, the trial court did not abuse its discretion in granting Stepfather's adoption petition, nor is its decision against the manifest weight of the evidence.

{¶42} Additionally, we conclude that the trial court did not abuse its discretion in admitting the assessor's report. Here, after Stepfather filed the adoption petition, the trial court appointed an assessor to conduct a home study as required by R.C. 3107.031. The assessor completed the home study and filed a written report with the trial court on October 7, 2024. The written report sets forth the assessor's recommendation that Stepfather's adoption petition be granted.

{¶43} Prior to the start of the best-interest hearing, Andrew objected to the assessor's report being admitted into evidence. Andrew argued, among other things, that the report was unduly prejudicial because the assessor failed contact him and his family during the investigation. The trial court overruled Andrew's objection finding that the assessor's report was filed in compliance with R.C. 3107.031. The trial court noted that Andrew could have subpoenaed the assessor to appear at the hearing for cross examination regarding the contents of the report, but failed to do so. Since the purpose of a home study is to "ascertain[ ] whether a person seeking to adopt a minor is suitable to adopt," the trial court's decision to admit the assessor's report into evidence is not unreasonable, arbitrary, or unconscionable. R.C. 3107.031.

{¶44} Accordingly, Andrew's second and third assignments of error are overruled.

{¶45} Having found no error prejudicial in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**MILLER and WILLAMOWSKI, J.J., concur.**

# <u>JUDGMENT ENTRY</u>

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  *See* App.R. 30.

William R. Zimmerman, Judge

Mark C. Miller, Judge

John R. Willamowski, Judge

DATED:
/hls